UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

CARLENE MARIE CHIESA,

                        Plaintiff,

       -against-                               1:13-CV-1102 (LEK)

COMMISSIONER OF SOCIAL
SECURITY,

                        Defendant.

_____

## MEMORANDUM-DECISION and ORDER

## I.    INTRODUCTION

      This case has proceeded in accordance with General Order 18, which sets forth the

procedures to be followed in appealing a denial of Social Security benefits.  Both parties have

filed briefs.  Dkt. Nos. 13 ("Plaintiff's Brief"); 19 ("Defendant's Brief").  For the following

reasons, the judgment of the Social Security Administration ("SSA") is vacated and remanded.

## II.    BACKGROUND

### A.  Plaintiff's Medical Records

      In December 2003, Plaintiff Carlene Chiesa ("Plaintiff") was injured while pushing a

disabled adult in a wheelchair at her job as a developmental assistant trainee for New York State

and has since suffered from pain throughout various parts of her body.  Dkt. No. 8 ("Record") at

547.[1]  While pushing the wheelchair, the chair jarred in a door frame.  Id.  Plaintiff injured her

left shoulder and experienced severe pain as a result.  Id.  She did not have similar symptoms

_____

      [1] Citations to the Record refer to the pagination assigned by the SSA.

prior to the injury, with the exception of lower back pain.  Id.  Following the injury, Plaintiff

missed a few days of work, but returned to work when she was able.  Id.

On December 22, 2003, Plaintiff sought treatment from Dr. Stewart Kaufman ("Dr.

Kaufman").  Id.  Plaintiff was assessed for left shoulder pain at the initial examination.  Id.

Plaintiff reported no neck pain or other symptoms during an examination with Dr. Kaufman on

February 20, 2004 and in March 2004, Plaintiff was "doing well . . . at work, full duty."  R. at

551-552.  In September 2004, however, Plaintiff stopped working.  R. at 43.  Plaintiff returned to

Dr. Kaufman in September 2004 for treatment of returning pain in her left shoulder; the pain

level was described as being 6-7 out of 10 when being used and 4-5 out of 10 when resting.  R. at

552.  In January 2005, Plaintiff described her pain as being 8-9 out of 10.  R. at 557.  Dr.

Kaufman's impression was that Plaintiff "may have mild impingement syndrome" and he

planned for her to continue with physical therapy treatment.  R. at 553.  In November 2004, Dr.

Kaufman concluded Plaintiff is "totally disabled from her current job.  She has gone through

therapy and has really failed."  R. at 555.  He observed that her neck had a full range of motion.

R. at 556.  Plaintiff underwent an MRI test that showed no overt pathology.  R. at 555.

On January 24, 2005, Plaintiff was examined by Dr. James Schneider ("Dr. Schneider")

after complaining of pain in her left shoulder.  R. at 273.  Dr. Schneider discussed the possibility

of surgery to determine the extent of the damage to her shoulder and also determined there to be

decreased range of motion in her neck.  Id.  On March 21, 2006, Plaintiff was evaluated by Dr.

Charles F. Gordon ("Dr. Gordon") for pain in her left neck, left arm, and left shoulder.  R. at 253.

Dr. Gordon recommended Plaintiff take part in aerobic activity to alleviate pain.  R. at 257.

Plaintiff chose to go through with the operation as her shoulder "has bothered her for so

long and it has been very disabling." R. at 566. On May 23, 2006 Plaintiff was operated on by Dr. Kaufman. R. at 278. Dr. Kaufman concluded that there was no tear of the rotator cuff in Plaintiff's shoulder and diagnosed Plaintiff with impingement syndrome of the left shoulder. Id. Dr. Kaufman's notes mention, "[Plaintiff] injured herself on 12/15/03 and it took until 10 weeks ago [in May 2006] to treat her." R. at 569. Plaintiff returned to Dr. Kaufman after the operation, still complaining of pain in her left shoulder (for example, when using her arm, a pain assessment of 5/5 was given when in motion during August 2006, and a pain assessment of 4/10 in her shoulder was given by Plaintiff in September 2006). R. at 566-567, 569-570.

Dr. Andrew Dubin ("Dr. Dubin") examined Plaintiff multiple times in 2006 and 2007. See R. at 265-69. Dr. Dubin's first evaluation stated that Plaintiff had not seen any change in symptoms postoperatively. R. at 268. Additionally, Dr. Dubin sought to pharmacologically treat Plaintiff's pain and trigger points through medication. R. at 267. Subsequent evaluations showed that she was responding to the medication. R. at 269. At Plaintiff's last appointment with Dr. Dubin, before she was referred back to her primary care physician, Dr. Dubin noted when examining her tender points for fibromyalgia, "[Plaintiff] has tenderness over the control points which are not typically tender in fibromyalgia." R. at 265.

On June 26, 2006, Plaintiff was examined by Dr. A. John Popp ("Dr. Popp") for neurosurgical treatment. R. at 261-62. Dr. Popp concluded that Plaintiff did not require neurosurgical treatment but that she would benefit from increased physical therapy and injections into her back and hips for pain management. R. at 262. This examination also revealed tenderness of the sacroiliac joints and tenderness on the trochanteric bursae. R. at 261. Plaintiff reported a pain level of 8/10 at the examination. Id.

Plaintiff was examined by Dr. Jerome J. Moga ("Dr. Moga") on November 28, 2007. R. at 758. Dr. Moga observed tenderness "in all areas." R. at759. Dr. Moga stated Plaintiff would be best fit for light duty work, as she "has a moderate, partial degree of casually related disability." Id. Dr. Moga examined Plaintiff again in July 2007 observing tenderness in the left shoulder. R. at 761.

On May 31, 2007, Plaintiff again sought treatment from Dr. Kaufman at Hudson Valley Orthopedic Associates. R. at 943. At the outset, Dr. Kaufman observed that Plaintiff was determined to be unable to work, but opined that Plaintiff would be able to return to work on August 1, 2007 to perform light duty work. Id. Plaintiff returned for a follow-up visit on June 11, 2007, where Dr. Kaufman noted Plaintiff was "feeling well" and "appear[ed] healthy and well developed." R. at 947. On July 12, 2007, Dr. Kaufman opined Plaintiff could return to work with light duty on September 15, 2007, as Plaintiff was "feeling well . . . not taking any medications prescribed from [Dr. Kaufman's] office. Patient is exercising daily. Physical activity is moderate. Pain is controlled and moderate." R. at 951. On August 10, 2007, Dr. Kaufman noted Plaintiff's pain in her shoulder "never totally gets better," he ordered an MRI of the left shoulder, and concluded she was unfit to return to work. R. at 954-55. Dr. Kaufman saw Plaintiff for follow-up visits and similarly concluded that Plaintiff was unable to work from September 2007 through April 2008. R. at 958, 961, 967, 973, 981, 989-90.

Plaintiff underwent surgery on February 19, 2008 for a 2006 injury in which she slipped getting out of a truck and twisted her right knee. R. at 985. At an appointment on May 30, 2008, Dr. Kaufman determined Plaintiff was able to work and classified her ability as limited to "desk work." R. at 993.

On February 18, 2008, Plaintiff was examined by Dr. Robert J. Roffman ("Dr. Roffman"). R. at 756-57. Dr. Roffman observed painless cervical motion, tenderness in both upper and lower extremities, and "generalized tenderness in the back and neck." R. at 756. Dr. Roffman concluded that there was post traumatic impingement syndrome in the left shoulder and found that Plaintiff exhibited a partial disability. R. at 757.

On October 3, 2008, Plaintiff was examined by Dr. John French ("Dr. French"). R. at 997. Dr. French opined that Plaintiff's medical history is consistent with fibromyalgia and also stated she likely does not have the necessary symptoms to establish reflex sympathetic dystrophy in her left shoulder. R. at 998. Later that month, Dr. Kaufman, concluded that Plaintiff could return permanently to work to perform light-duty desk work as she continued pain management treatment. R. at 1000; see also R. at 1010, 1017, 1031, 1040, 1044-45 (confirming in other follow-up visits that Plaintiff was able to perform light-duty desk work).

In 2008, Plaintiff was treated by Dr. Tomasz Andrejuk ("Dr. Andrejuk") for pain management through injections. R. at 421-29. After treatment, Plaintiff reported reductions in her discomfort. R. at 429. Dr. Andrejuk believed prior treatment was not effective and "a more aggressive approach, including minor injections, would be appropriate." R. at 435.

On October 12, 2009, Plaintiff saw Dr. Amelita Balagtas ("Dr. Balagtas"), who stated "[Plaintiff] appeared to be in no acute distress. She walks with a slight limp." R. at 817. Dr. Balagtas also noted "[Plaintiff] would have moderate limitations in activities that require bending, lifting, prolonged sitting, standing, walking, and activities that require kneeling and squatting." R. at 818. Plaintiff saw Dr. Balagtas again on December 14, 2010, where Dr. Balagtas concluded that Plaintiff would have "slight-to-moderate limitations" with daily

activities.  R. at 1121.

On January 20, 2009, Plaintiff was examined by Dr. Shashi D. Patel ("Dr. Patel").  R. 751-53.  Dr. Patel concluded that per the guidelines of New York State Workers' Compensation, Plaintiff "has a moderate, partial degree of causally related disability."  R. at 752.  Plaintiff was reexamined by Dr. Patel on May 20, 2009, where he concluded that Plaintiff had a twenty-five percent loss of use of the left arm.  R. at 750.  Dr. Patel examined Plaintiff again on November 20, 2009 and observed that Plaintiff "does not appear to be acute pain or discomfort."  R. at 747.  At the conclusion of the physical exam, Dr. Patel opined that "[e]ven after five years after her injury, her symptoms still continues [sic].  Her complaints are out of proportion to an identifiable pathology."  Id.

On January 11, 2010, Plaintiff was examined by Dr. Koshnaf Antar ("Dr. Antar"), where she complained of severe pain.  R. at 938.  At a follow-up visit in February 2010, Dr. Antar concluded that Plaintiff has "non-musculoskeletal pain consistent with fibromyalgia with no evidence to suggest any inflammatory arthritis/connective tissue disease at this point."  R. at 937.

On February 17, 2010, Plaintiff was examined by Dr. Quentin S. Phung ("Dr. Phung").  R. at 1085.  Dr. Phung noted that although Plaintiff's signs and symptoms are consistent with fibromyalgia, she experiences pain throughout her whole body.  R. at 1086.  Further, treatment on the left shoulder itself would not make a large impact on Plaintiff's pain as the shoulder was only a small fraction of the total pain being felt.  Id.  Plaintiff was classified as having a temporary disability and deemed not a good candidate for medication as she was highly allergic to various medications.  R. at 1072, 1074.  Dr. Phung examined Plaintiff again on April 21, 2010, where he recommended a functional capacity evaluation to "determine what type of job she

would be capable of doing."  R. at 1083.

During the relevant time period of Plaintiff's claim, she was also receiving mental health treatment.  On October 12, 2009, Plaintiff received a psychiatric evaluation from Dr. Brett T. Hartman ("Dr. Hartman").  R. at 821.  After gathering background information about Plaintiff's personal life, education, and work experience, Dr. Hartman reported all "average," "fair," or "mild" findings.  R. at 823-24.  For instance, Plaintiff's intellectual functioning was average, her insight and judgment were fair, and her attention and concentration were observed to be mildly affected.  Id.  Beginning in April 2005 Plaintiff sought mental health treatment from Greene County Mental Health Center for issues regarding relationships, family, parenting, and identity.  R. at 612, 620.  Plaintiff's treatment there continued until January 2011.  R. at 1151.

On December 14, 2010, Plaintiff was evaluated by Dr. Kerry Brand ("Dr. Brand").  R. at 1114.  Plaintiff stated that she had difficulty sleeping and typically woke up four times during the night.  Id.  She also complained of loss of appetite, losing seventy pounds as a result.  Id.  Plaintiff reported many stressors that caused a continued period of depression.  R. at 1115.  Dr. Brand concluded "[Plaintiff] may have moderate difficulty maintaining attention and concentration and maintaining a regular schedule.  She may have mild to moderate difficulty learning new tasks and performing complex tasks independently. . . . Results of the evaluation are consistent with some psychiatric problems which may significantly interfere with . . . [Plaintiff's] ability to function on a daily basis."  R. at 1117.

On December 29, 2010, A. Herrick performed a mental residual functional capacity ("RFC") assessment on Plaintiff.  R. 1137-39.  The assessment concluded that Plaintiff was capable of "adjusting to the usual demands of regular entry level work" and carrying out tasks

after receiving instructions.  R. at 1139.

**B.  Procedural History and ALJ Hearing**

On November 5, 2010, Plaintiff filed a Title II Application for disability insurance benefits, alleging disability with an onset date of September 11, 2004.  R. at 65, 116.  The Application was denied on January 5, 2011.  R. at. 65.  On March 4, 2011, Plaintiff filed a request for a hearing with an Administrative Law Judge ("ALJ").  R. at 86.

On December 6, 2011, Plaintiff appeared with a non-attorney representative for a hearing before ALJ Arthur Patane in Albany, New York.  R. at 40.  Plaintiff was accompanied by Ms. Janice Comarotto, a non-attorney representative.  Id.  The ALJ began the questioning at the hearing.  Id.  Plaintiff testified that the last time she worked was on September 11, 2004, as a developmental assistant trainee for New York State.  R. at 43.  Plaintiff testified she was terminated after three years of employment because she suffered a left shoulder injury while on the job.  R. at 43-44.  The ALJ asked Plaintiff what interfered with her ability to work and she stated she continued to suffer from a shoulder injury and she has fibromyalgia.  Id.  Plaintiff testified that she sought treatment from Dr. Andrejuk, Dr. Schneider, and Dr. Kaufman for fibromyalgia.  R. at 45.  Plaintiff was going to receive acupuncture but had difficulty getting approved.  Id.  Plaintiff testified that she was a high school graduate and had "maybe 23" college credits.  R. at 46.   She hoped to return to Empire State College, where she was previously dismissed because "[she] didn't do very well."  R. at 47.

Plaintiff testified that her sixteen year old son is autistic and she receives Supplemental Security Income for him.  R. at 47, 48.  Her son participates in a virtual school that is completed at home through email and telephone.  R. at 48.  Plaintiff stated her son helps with physical tasks

8

such as cooking and cleaning, but he is limited in his cooking ability. R. at 48. Plaintiff stated

that she is moving to Florida "because it helps with [her] health," as the cold weather causes her

pain to flare up. R. at 48-49. The ALJ asked Plaintiff about the extent of her exercise on a daily

basis; Plaintiff testified that she walks her dog and takes him in the yard. R. at 49. Plaintiff

added that she has an old knee injury that she is mindful of, and is careful that "[she] [doesn't]

overdo it." Id. The ALJ noted that Plaintiff had prior unsuccessful applications for benefits in

2005 and 2009 based on the same disabilities that Plaintiff claimed in the current hearing. R. at

50. Plaintiff's attorney stated that his client did not appeal these unfavorable applications

because she lost contact with him. Id.

 After this series of questions, the ALJ allowed Plaintiff's attorney to ask questions. R.

50-57. Plaintiff stated that acupuncture was the only treatment available to her due to her severe

allergies to medication. R. at 50. Plaintiff's attorney asked Plaintiff whether she can partake in

strenuous exercise; Plaintiff responded, "[t]hat's not even an option . . . I walk a little bit . . . I

take the dog out in the yard, but other than that, running is not going to happen." R. at 51.

Plaintiff stated she had surgery on her left shoulder in 2006, but continues to endure pain in her

shoulder. Id. Plaintiff was also asked about other surgeries or injuries that she has experienced.

R. at 52. Plaintiff responded that she has had surgery on her right knee, removing the plica, but

"[she] still has issues with it." Id. Plaintiff testified that she uses "her right hand for pretty much

everything," but will use both hands if necessary. Id. Plaintiff has flare-ups from her

fibromyalgia "at least a couple times a month," which often requires her to remain in bed. R. at

53. Plaintiff affirmed that flare-ups occur for about half of any given month. R. at 57.

Injections in the past have done "nothing to fix the injury," as many were completed before her

surgery.  R. at 53.

Plaintiff's attorney then questioned Plaintiff about her neck pain and headaches.  R. at 54.

Plaintiff opined her shoulder injury has caused muscles to affect the functioning of her neck, and

that she experiences migraines, a major side effect of fibromyalgia.  R. at 54.  Plaintiff testified

that she is unable to sit or stand for long periods of time, no more than "like half an hour."  R. at

54-55.  Plaintiff added that she also is unable to reach above her head, has issues with balance,

and experiences fatigue.  R. at 55-56 (describing how her energy level is always low and she

alleges she goes for "days and days without sleep," and the pain and fatigue problems become a

"vicious cycle").

Plaintiff was asked a series of questions about her mental health issues.  R. at 56-57.

At the time of the hearing, Plaintiff stated that she dealt with depression, but has learned coping

skills and strategies to manage it.  R. at 56.  Plaintiff testified that she does not take

antidepressants because she has a bad reaction to them and they are "not worth doing."  R. at 57.

Lastly, Plaintiff testified that she has trouble concentrating and focusing.  Id.  Similar troubles

arose when she was in college when stress caused her to be unable to "write papers and stuff . . .

[that was too much]."  Id.

The ALJ issued an unfavorable decision on March 9, 2012.  R. at 19.  The ALJ followed

the five-step sequential evaluation process established by the SSA for determining whether an

individual is disabled.  R. at 22-24.  The ALJ found that Plaintiff last met the insured status

requirements of the Social Security Act on December 31, 2010.  R. at 24.  The ALJ determined

Plaintiff did not engage in substantial gainful activity from her onset date of September 11, 2004

through her date last insured.  Id.  Through the last date insured, the ALJ found that Plaintiff had

multiple severe impairments, more specifically, "status post left shoulder arthoscopic surgery, status post right knee surgery, fibromyalgia dysthymic disorder, posttraumatic stress disorder, and generalized anxiety disorder." Id.  While the ALJ found that Plaintiff had severe impairments, he also found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. § 404(P) Appendix I. Id.  The ALJ found that Plaintiff had the RFC to perform light work as defined by 20 C.F.R. § 404.1567(b).  R. at 25.  The ALJ determined Plaintiff can only perform occasional kneeling or squatting, was limited to occasional pushing/pulling/reaching with the left upper extremity, and could not engage in overhead work or climb ladders, ropes, or scaffolds. Id. The ALJ stated that Plaintiff's impairments prevented her from performing any of her past relevant work.  R. at 30.  However, given Plaintiff's age, education, work experience, and RFC, the ALJ found that there were jobs that existed in significant numbers in the national economy that Plaintiff could perform.  R. at 31.  Under the standards set forth in the Social Security Act, the ALJ concluded that Plaintiff was not disabled between September 11, 2004, the alleged onset date of disability, and December 31, 2010, the date last insured.  Id.  Therefore, the ALJ found the Plaintiff was not disabled under §§ 216(I) and 223(d) of the Social Security Act. Id.

Plaintiff filed a request for review on March 22, 2012.  R. at 17-18.  On July 15, 2013, the Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the SSA Commissioner ("Commissioner").  R. at 1-5.  Plaintiff timely filed an appeal on September 6, 2013.  Dkt. No. 1 ("Complaint").

III.    **LEGAL STANDARD**

**A.  Standard of Review**

11

When the Court reviews the SSA's final decision, it determines whether the ALJ applied the correct legal standards and if the decision is supported by substantial evidence in the record. 42 U.S.C. § 405(g); Roat v. Barnhart, 717 F. Supp. 2d 241, 248 (N.D.N.Y. 2010) (Kahn, J.) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982)). Substantial evidence amounts to "more than a mere scintilla," and it must reasonably support the decision maker's conclusion. Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). The Court defers to the Commissioner's decision if it is supported by substantial evidence, "even if it might justifiably have reached a different result upon a *de novo* review." Sixberry v. Colvin, No. 12-CV-1231, 2013 WL 5310209, at *3 (N.D.N.Y. Sept. 20, 2013) (quoting Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037, 1041 (2d Cir. 1984)). However, the Court should not uphold the ALJ's decision when it is supported by substantial evidence, but it is not clear that the ALJ applied the correct legal standards. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987).

**B. Standard for Benefits**

According to SSA regulations, disability is "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). An individual seeking disability benefits "need not be completely helpless or unable to function." De Leon v. Sec'y of Health & Human Servs., 734 F.2d 930, 935 (2d Cir. 1984) (quoting Gold v. Sec'y of Health, Educ. & Welfare, 463 F.2d 38, 41 n.6 (2d Cir. 1972)).

In order to receive disability benefits, a claimant must satisfy the requirements set forth in

the SSA's five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(1). In the first four

steps, the claimant bears the burden of proof; at step five, the burden shifts to the SSA. Kohler v.

Astrue, 546 F.3d 260, 265 (2d Cir. 2008) (quoting Perez v. Chater, 77 F.3d 41, 46 (2d Cir.

1996)). The five-step analysis used by the SSA is sequential, meaning that the determination at

each step dictates whether the analysis proceeds to the subsequent step. Gennardo v. Astrue, 333

F. App'x 609, 610 (2d Cir. 2009). If the SSA is able to determine that the claimant is disabled or

not disabled at any step, the evaluation ends. 20 C.F.R. § 404.1520(a)(4). Otherwise, the SSA

will proceed with the analysis. Id.

At step one, the SSA considers whether the claimant's current work is "substantial

gainful activity." 20 C.F.R. § 404.1520(a)(4)(I). If it is, the claimant is not disabled under the

SSA standards. Id. At step two, the SSA considers whether the claimant has a severe medically

determinable physical or mental impairment, or combination of impairments that is severe, that

meets the duration requirement in 20 C.F.R. § 404.1509. Id. § 404.1520(a)(4)(ii). If she does not

have such an impairment, the claimant is not disabled under the SSA standards. Id. At step

three, the SSA considers the severity of the claimant's medically determinable physical or mental

impairment(s) to see if it meets or equals an impairment and the requisite duration listed in 20

C.F.R. § 404(P), Appendix I. Id. § 404.1520(a)(4)(iii). If it does not, the SSA continues to step

four to review the claimant's RFC and past relevant work. Id. § 404.1520(a)(4)(iv). The

claimant is not disabled under the SSA standards if the RFC reveals that the claimant can

perform past relevant work. Id. If the claimant cannot perform her past relevant work, the SSA

decides at step five whether adjustments can be made to allow the claimant to work somewhere

in a different capacity. Id. § 404.1520(a)(4)(v). If appropriate work does not exist, then the SSA

considers the claimant to be disabled.  Id.

## IV.  DISCUSSION

Plaintiff argues that the ALJ erred by: (1) ignoring the opinion of treating pain management specialist Dr. Phung; (2) ignoring the opinion of independent medical examiner Dr. Patel; (3) ignoring the opinion of independent medical examiner Dr. Roffman; (4) failing to consider the effect of Plaintiff's cervical degenerative disc disease on Plaintiff's ability to work; (5) failing to obtain testimony of a vocational expert as a result of multiple non-exertional limitations.  Pl.'s Br. at 1.

### A.  Failure to Evaluate and Weigh Physicians' Opinions

Plaintiff claims that the ALJ ignored the opinion Dr. Phung, Dr. Patel, and Dr. Roffman. Pl. Br. at 1.  An ALJ must base their final determination on substantial evidence, by assigning weight to all medical opinions within the record.  See Hamedallah ex rel. E.B. v. Astrue, 876 F. Supp. 2d 133, 148 (N.D.N.Y. 2012) ("Because the ALJ failed to assign weight or to explain the weight he afforded to any conclusions or opinions, the Court is constrained to find that his conclusions are supported by substantial evidence.  Accordingly, on remand, the ALJ should discuss and analyze claimant's medical records . . . .").  The ALJ must mention a medical opinion, assign weight to it, or specifically reject it.  Id.; see also 20 C.F.R. § 404.1527(d) ("Regardless of its source, we will evaluate every medical opinion we receive.").

When combing through the record, the ALJ is not required to mention every piece of evidence or testimony within a physician's notes or summarized opinion.  See Davis v. Colvin, No. 14-CV-6650T, 2015 WL 9459966, at *4 (W.D.N.Y. Dec. 23, 2015).  However, medical opinions cannot summarily be rejected without any analysis by the ALJ.  Aubeuf v. Schweiker,

649 F.2d 107, 112 (2d Cir. 1981); <u>McLaughlin v. Secretary of HEW</u>, 612 F.2d 701, 705 (2d Cir. 1980). It is error for an ALJ not to state the weight given to all of a claimant's treating sources. <u>Brown v. Astrue</u>, No. 08-CV-1165, 2009 WL 5219028, at *8 (N.D.N.Y. Dec. 31, 2009) (Kahn, J.). It is acceptable for an ALJ to not specifically reference a physician by name because the physician's opinion may be referenced by its factual nature or by an exhibit number, and thus is deemed considered and adequately weighed in the ALJ's determinations. <u>See</u> <u>Wilbur v. Colvin</u>, No. 5:13-110, 2014 WL 2434955, at *2 (N.D.N.Y. May 30, 2014) (describing as permissible how an ALJ's decision may not mention a physician by name, but the physician's opinion is referenced by exhibit numbers within the record).

An ALJ cannot deny disability benefits where the ALJ did not give a reason for rejecting medical opinions favoring a plaintiff. <u>Fiorello v. Heckler</u>, 725 F.2d 174, 176 (2d Cir. 1983). An opinion or conclusion of partial or total disability in the workers' compensation context is not binding on an ALJ's determination of disability under SSA, however, all medical opinions must be at least addressed by an ALJ. <u>Cobbins v. Comm'r</u>, 32 F. Supp. 3d 126, 135 (N.D.N.Y. 2012).

If applicable, an ALJ must also apply the "treating physician rule." <u>See</u> <u>Jones v. Shalala</u>, 900 F. Supp. 663, 669 (S.D.N.Y. 1995) (holding that more weight can be given to a treating physician than that of a consulting physician). Under the "treating physician rule," the opinion of a treating physician is given controlling weight where it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence." 20 C.F.R. § 404.1527(c)(2); <u>see also</u> <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004). However, a treating physician's opinion need not be given controlling weight where it is contradicted by other substantial evidence in the record. <u>Veino v. Barnhart</u>, 312 F.3d

578, 588 (2d Cir. 2002). "[T]he less consistent [an opinion] is with the record as a whole, the less weight it will be given." Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999). When an ALJ does not give controlling weight to a treating physician's opinion, then the ALJ must consider the following factors in determining the appropriate weight to assign to the opinion:

> (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship; (iii) the extent to which the opinion is supported by relevant evidence; (iv) the consistency of the opinion with the record as a whole; (v) specialization; and (vi) other factors.

20 C.F.R. § 404.1527(c)(2).

An ALJ is required to explain the weight given to the opinion of a treating physician and must give "good reasons" for the particular weight assigned. Snell, 177 F.3d at 133.

### 1. Dr. Phung and Dr. Roffman

Plaintiff is correct when asserting the ALJ ignored the opinions of Dr. Phung and Dr. Roffman. The ALJ's opinion lacks any substantial reference by name or substance to the medical opinions of these two doctors. See R. at 22-31. While it is true that an ALJ is not required to go through every "shred of medical testimony," a physician's opinion cannot be disregarded without any mention whatsoever. Fiorello, 725 F.2d at 176 (citing Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981)); O'Connell v. Astrue, No. 06-CV-1113, 2009 WL 606155, at *24 (N.D.N.Y. Mar. 9, 2009) (Kahn, J.) ("[T]he ALJ must 'evaluate every medical opinion' he receives according to the regulations . . . .'Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s).'") (quoting 20 C.F.R. § 404.1527(a)(2)).

Dr. Roffman's opinions appear throughout the record, however the ALJ fails to address or analyze them. Dr. Roffman observed painless cervical motion, tenderness in both upper and

lower extremities, and "generalized tenderness in the back and neck." R. at 756. Dr. Roffman concluded that there was post traumatic impingement syndrome in the left shoulder and that Plaintiff exhibits a partial disability. R. at 757. Dr. Roffman also observed "limited painful motion of the head and neck." R. at 755.

Similarily, the ALJ makes no mention of Dr. Phung's medical opinion. Dr. Phung noted that Plaintiff's signs and symptoms are consistent with fibromyalgia, however her pain is throughout her whole body. R. at 1086. Further, Dr. Phung opined that treatment on the shoulder itself would not make a large impact on Plaintiff's overall pain. Id. Plaintiff was classified as having a temporary disability and deemed not a good candidate for medication as she was highly allergic to various medications. R. at 1072, 1074. Dr. Phung's medical opinion provided that if treatment did occur "we may have a chance to achieve some functional goals." R. at 1072. These medical opinions can objectively be seen as favorable to Plaintiff, and thus the ALJ was required to address them and state the weight afforded to them.

The ALJ refers to the exhibit in which these opinions appear, however he uses the exhibit to discuss other medical opinions within the record. See, e.g., R. at 27 (discussing Dr. Moga's and Dr. Zickel's opinions but making no reference to Dr. Phung or Dr. Roffman). As both of these doctors are not mentioned by name nor referenced in the ALJ's opinion, it was error for the ALJ not to analyze or assign weight to their opinions. See Brown, 2009 WL 5219028, at *8. Accordingly, on remand, the ALJ should discuss and analyze Plaintiff's medical records and opinions from Dr. Phung and Dr. Roffman and assign weight to them in accordance with the standards set forth by the SSA.

   *2. Dr. Patel*

Plaintiff argues that the ALJ also erred in ignoring the opinion of Plaintiff's treating physician, Dr. Patel. Pl.'s Br. at 5. Plaintiff claims the opinion of Dr. Patel was ignored by the ALJ. Unlike the ALJ's lack of reference to the opinions of Dr. Roffman and Dr. Phung, the ALJ's decision makes specific reference to Dr. Patel, by stating "[he] did not have an explanation of her failure to improve following her surgery, as her post-operative diagnostics were unremarkable. He felt her complaints were out of proportion to identifiable pathology." R. at 26 (quoting Dr. Ferraraccio's opinion of the apparent unreliability of Dr. Patel's records). The ALJ erred when he merely mentioned Dr. Patel's opinions, but did not discuss them at all. See Babcock v. Barnhart, 412 F. Supp. 2d 274, 281 (W.D.N.Y. 2006) (finding error when findings are not discussed, as the SSA regulations require an evaluation of every medical opinion). While the ALJ notes Dr. Ferraccio's account of Dr. Patel's opinions, the ALJ does not address all of Dr. Patel's opinions or state what weight is being given to them. For example, Dr. Patel opined that Plaintiff should be seen by a rheumatologist as Plaintiff's complaints of symptoms relating to fibroymalgia could be induced by trauma. R. at 747. The ALJ did not evaluate Dr. Patel's opinions, but dismissed them without any analysis. Although some of the conclusions made by Dr. Patel referred to standards set forth by the Workers' Compensation Board and are thus not binding on the ALJ's determination, the opinions still require analysis and weighing in accordance with SSA regulations. See, e.g., Vincent v. Shalala, 830 F. Supp. 126, 131 (N.D.N.Y. 1993) (describing how even though a doctor's opinions were made in the context of workers' compensation, "it was perfectly appropriate for the ALJ to weigh the reports as he saw fit"). Accordingly, on remand, the ALJ should discuss and analyze Plaintiff's medical records and opinions from Dr. Patel.

**B. Cervical Degenerative Disc Disease**

Plaintiff argues the ALJ failed to consider the effect of Plaintiff's cervical degenerative disc disease on her ability to work.  Pl.'s Br. at 1.  Plaintiff points to the ALJ's decision where Plaintiff's severe impairments were determined to be "status post left shoulder anthroscopic surgery, status post right knee surgery, fibromyalgia, dysthymic disorder, posttraumatic stress disorder, and generalized anxiety disorder."  R. at 24; Pl.'s Br. at 6.

Even if the ALJ erred in not including the cervical degenerative disc disease as a severe impairment, the error will be deemed harmless if the ALJ considered all impairments (severe and non-severe) in his RFC determination.  Pepper v. Commissioner, No. 13-cv-978, 2015 WL 3795879, at *2 (N.D.N.Y. June 17, 2015); see also 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' . . .  when we assess your [RFC].").  The mere presence of a disease or impairment is not enough, by itself, to render a condition "severe."  Coleman v. Shalala, 895 F. Supp. 50, 53 (S.D.N.Y. 1995).  As Defendant points out, Plaintiff did not include cervical degenerative disc disease as a separate condition, but did include "[her] back" as limiting her ability to work.  See R. at 156.

Although the ALJ did not classify Plaintiff's cervical degenerative disc disease as a severe impairment, he still evaluated the impact of Plaintiff's back pain on her ability to work. See R. at 22-31.  First, the ALJ noted Dr. Balagtas' diagnosis Plaintiff with low back pain, however, the ALJ pointed to  Dr. Balagtas' observation of  "symptom magnification or exaggeration" in test results.  R. at 27.  Second, Dr. Balagtas assessed Plaintiff with back pain during a second visit, again noting a discrepancy in Plaintiff's complaints.  Id.  The ALJ noted

that x-rays of Plaintiff's spine were normal and Plaintiff had "relatively well-maintained intervertebral disc spaces." R. at 27-28; see also R. at 1119-22. Third, the ALJ mentioned Dr. Kaufman's observation that Plaintiff had a "normal . . . range of motion in her spine and lower extremities." R. at 28. The ALJ noted multiple discrepancies between Plaintiff's subjective complaints of back pain and objective medical opinions and tests performed by her physicians. Id. Plaintiff does not substantiate any argument relating to limitations caused solely by her degenerative disc disease. See Bartrum v. Astrue, 32 F. Supp. 3d 320, 328 (N.D.N.Y. 2012) ("[B]ecause the ALJ found that Plaintiff suffered from other severe impairments, was aware of (and incorporated) the evidence concerning chronic headaches, and continued with the sequential analysis, any arguable error in not considering the headaches as a separate impairment was, under the circumstances, harmless."). Accordingly, the ALJ's failure to evaluate Plaintiff's degenerative disc disease as a separate impairment was harmless under the circumstances.

In terms of neck pain, the ALJ's decision refers to Exhibit B3F (pages 265-73 of the Record), noting that objective "medical test result[s] in the record [are] described as mild or normal." R. at 26. Plaintiff argues that the ALJ ignored specific neck pain medical records. See R. at 268, 272-73. The ALJ addressed Exhibit B3F in which some of these records appear, but also specifically refers to Dr. Dubin's examination of the Plaintiff in January 2007. Id. The ALJ noted Dr. Dubin's observation that Plaintiff appeared "reasonably comfortable." Id.; see also R. at 267. The ALJ was aware of Plaintiff's neck pain and took it into consideration by "careful consideration of the evidence." R. at 26.

### C. Vocational Expert Testimony

Plaintiff argues that the ALJ failed to obtain a vocational expert's testimony in step five

of the SSA analysis, even though he was obligated to do so. Pl.'s Br. at 7. The Court declines to

determine whether the ALJ was correct in not obtaining a vocational expert, as the ALJ's failure

to evaluate the opinions of Dr. Phung, Dr. Patel, and Dr. Roffman require the Court to find that

his decision was not made based upon substantial evidence.

Under SSR 83-12, the ALJ is not obliged to elicit testimony from vocational experts

when a claimant's RFC falls within the categories of the grids. Gravel v. Barnhart, 360 F. Supp.

2d 442, 448 (N.D.N.Y. 2005) ("The purpose of SSR 83-12 is to clarify the use of the Grids as a

framework for disability determinations when an individual's exertional RFC does not fall within

any of the categories of work as defined in sections 404.1567 and 416.967 of the Regulations.").

If the RFC does not fall within an exertional category, the use of Grids "will not be

determinative." Id. at 449. An ALJ must then rely on a vocational expert in making a disability

determination. Id. An ALJ's failure to elicit testimony from a vocational expert does not

constitute an error in the step five determination if the ALJ's RFC determination is supported by

substantial evidence. On remand, the ALJ must first consider the opinions of all of Plaintiff's

physicians, and then determine whether a vocational expert is required.

## V.     CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that the decision of the Commissioner is **VACATED and REMANDED**

for the ALJ to address the medical opinions of Dr. Phung, Dr. Patel, and Dr. Roffman in a

manner consistent with this Memorandum-Decision and Order; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and

Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:      March 11, 2016
              Albany, New York

Lawrence E. Kahn
U.S. District Judge